## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**DAVID R. KELLY,**

      **Plaintiff,**

**vs.**

                              **Civil Action 2:10-cv-00775**
                              **Judge Algenon L. Marbley**
                              **Magistrate Judge E.A. Preston Deavers**

**COMMISSIONER OF SOCIAL**
**SECURITY,**

      **Defendant.**

## REPORT AND RECOMMENDATION

## I. INTRODUCTION

Plaintiff, David R. Kelly, brings this action under 42 U.S.C. §§405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for supplemental social security income. Plaintiff filed his current application for supplemental social security income on March 9, 2006,[1] alleging that he has been disabled since December 15, 2002 due to diabetes, learning impairment, poor eyesight, and back and neck pain. (R. at 67, 161.) The application was denied initially and again upon reconsideration. Plaintiff requested a *de novo* hearing before an administrative law judge ("ALJ").

On June 30, 2009, ALJ Nino A. Sferrela held a hearing at which Plaintiff, represented by counsel, appeared and testified. Medical and vocational experts also appeared and testified at the hearing. On August 4, 2009, the ALJ issued a decision finding that Plaintiff was not disabled

---

[1] Plaintiff filed previous applications for disability insurance and supplemental security income benefits in September 2004. These application were denied initially and upon reconsideration.

within the meaning of the Social Security Act.  The Appeals Council denied Plaintiff's request

for review and adopted the ALJ's decision as the Commissioner's final decision on July 6, 2010.

Plaintiff timely commenced this action.

This matter is before the Magistrate Judge for a report and recommendation on Plaintiff's

Statement of Errors (ECF No. 10) and the Commissioner's Memorandum in Opposition (ECF

No. 13).  In his Statement of Errors, Plaintiff maintains that the ALJ erred in rejecting the

opinions of the medical expert and also erred in failing to give controlling weight to the opinions

of Plaintiff's primary treating sources.  For the reasons that follow, the undersigned

**RECOMMENDS** that the Court **AFFIRM** the decision of the Commissioner.

## II.  PLAINTIFF'S TESTIMONY

Plaintiff was thirty-seven years old at the time of the administrative hearing.  (R. at 67.)

He has past work experience as a fast food worker, assembly line worker, and construction

worker.  (R. at 129–32, 162.)

At the hearing, Plaintiff stated that he completed the tenth grade.  (R. at 635.)  Plaintiff

noted that he was in developmentally handicapped classes.  (R. at 635–36.)  Plaintiff testified to

being able to perform simple math, read, and write.  (R. at 636.)  He indicated, however, that he

had some difficultly in these tasks.  (*Id.*)  He left school because it became too stressful.  (*Id.*)

Although Plaintiff's hearing testimony was at times unclear, he testified that the primary

reason he stopped working was his back pain.  (R. at 638, 647.)  Plaintiff described pain running

from the middle of his back to his tailbone.  (R. at 643.)  He also described having pain from his

upper back to his neck.  (R. at 644.)  He noted that he sought medical care from a pain specialist

and received steroid injections, although he maintained these injections did not help his pain.

2

(R. at 643–44.)

Plaintiff testified to receiving a diabetes diagnosis around 2003.  (R. at 639, 640.)  He reported problems keeping his diabetes under control and having blood sugar attacks.  (R. at 641.)  Plaintiff testified to having episodes of seizures and passing out.  (R. at 645.)  Plaintiff also reported constant numbness in his legs.  (R. at 640, 648.)  At the time of the hearing, Plaintiff stated that he had been using a cane as a precaution due to the pain in his legs and back.  (R. at 642.)  He specifically testified to falling down in the past because his left leg would give out.  (R. at 655.)  Plaintiff also reported breathing problems.  (R. at 646–47.)

Finally, Plaintiff answered questions regarding his mental impairments at the June 2009 hearing.  Plaintiff noted having anger issues, problems with his memory, difficulties in concentration, and depression.  (R. at 646, 650, 652.)  According to Plaintiff, he has difficulty getting along with others.  (R. at 652.)  Plaintiff also reported sleep disturbance, but had trouble describing the cause.  (R. at 654.)

Comments within Plaintiff's testimony suggest that he does at least some driving and helps with household chores.  (R. at 635, 643.)

### III. MEDICAL RECORDS

A.    Physical Impairments

    1.    Treatment Notes

Plaintiff was admitted to the hospital on March 6, 2003, complaining of nausea, vomiting, and abdominal pain.  (R. at 193.)  At this time, the doctors diagnosed him with diabetic ketoacidosis as well as diabetes mellitus, type I.  (R. at 173, 179, 184.)  Plaintiff visited the hospital in both September and October of 2004 for hypoglycemia related problems.  (R. at

250–51, 266–67.)

On October 10, 2004, Plaintiff presented to the hospital complaining of low back pain. (R. at 262.)  He reported having the pain for the past year.  (*Id.*)  Plaintiff's treatment notes also mention complaints of numbness and tingling secondary to neuropathy.  (*Id.*)  An X-ray of Plaintiff's lumbar spine was negative for fracture and demonstrated no acute abnormalities.  (R. at 263–64.)  Plaintiff reported to the hospital again on February 24, 2005 complaining of chest pain.  (R. at 385.)  It appears Plaintiff was diagnosed with costochondritis.  (*See* R. at 380.)

Plaintiff began treating with Mohamed Hussan Hamza, M.D., at least as early as March 23, 2003.  (R. at 338–39.)  During his treatment of Plaintiff, Dr. Hamza consistently diagnosed him with poorly controlled insulin dependent diabetes mellitus.  (R. at 283–339.)  Dr. Hamza noted Plaintiff's complaints of chest pain.  (*See, e.g.*, R. at 326, 328.)  The records also indicate Dr. Hamza was treating Plaintiff for back pain, attention deficit disorder, and anxiety.  (R. at 283–97.)  On December 29, 2004, an EMG revealed normal results.  (R. at 287.)  A January 2005 MRI of the lumbar spine resulted in generally normal findings.  (R. at 437.)

Plaintiff continued to receive treatment from Dr. Hamza from January 2005 until December 2008.  (R. at 455–75, 563–99.)  In January 2005, Plaintiff reported that Vicoden was not helping his back pain.  (R. at 474.)  During this time frame Dr. Hamza's frequently diagnosed Plaintiff with diabetic neuropathy.  (R. at 455–69.)  Examinations in March, April, and June of 2006 revealed normal gait, station, and range of motion.  (R. at 255, 459, 462.)  Examination of Plaintiff's lungs revealed no wheezing, rhonci, or rales.  (*Id.*)  Dr. Hamza noted fluctuating blood sugar levels in September and October of 2006.  (R. at 585–88.)  In January 2007, Plaintiff reported having hypoglycemia.  (R. at 581.)  Dr. Hamza's treatment notes provide

4

some indications of non-compliance on Plaintiff's part, but with little detail.  (*See, e.g.*, R. at 570, 575.)  Although Plaintiff continued to report back pain, Dr. Hamza's physical examinations revealed generally normal muskuloskeletal findings.  (*See, e.g.*, 571, 573.)  In January 2008, Dr. Hamzas recommended regular exercise.  (R. at 570.)  In April 2008, Dr. Hamzas noted that Plaintiff was walking with a cane.  (R. at 567.)

Nicholas Varrati, M.D., began treating Plaintiff on February 3, 2005.  (R. at 428–30.)  At this time, Plaintiff reported having right cervical pain for four months.  (*Id.*)  He also complained of numbness to his right hand, and occasional weakness in his right arm and leg.  (R. at 438.)  Upon physical examination of the cervical spine, Dr. Varrati noted "tenderness to palpation over the C4-5, C5-6 paravertebral musculature."  (*Id.*)  Plaintiff underwent an MRI of the cervical spine on March 11, 2005.  (R. at 435–36.)  The test revealed "[e]ssentially normal cervical spine."  (*Id.*)  On March 17, 2005, after reviewing the MRI, Dr. Varrati diagnosed Plaintiff with chronic cervical pain and recommended physical therapy.  (R. at 433.)  In September 2005, Dr. Varrati noted some improvement with Plaintiff's cervical pain.  (R. at 422.)  In December 2005, Dr. Varrati wrote that Plaintiff's cervical pain was of an undetermined etiology.  (R. at 405.)  Dr. Varrati also noted Plaintiff had missed several physical therapy appointments.  (*Id.*)  Dr. Carrati's March 2006 physical examination revealed reduced cervical flexion.  (R. at 404.)  A March 28, 2006 PVR study revealed normal arterial blood flow in the lower extremities.  (R. at 401.)  On May 11, 2006, Plaintiff noted that his back pain was decreasing, and rated its severity as a two to three on a ten point scale.  (R. at 458.)  Plaintiff continued to report improvement in July 2006.  (R. at 457.)  Physical examination, however, continued to reveal tenderness.  (*Id.*)

On May 31, 2007, Plaintiff began treatment with Michael F. Sayegh, M.D., a pain

management specialist.  (R. at 553–54.)  Plaintiff reported constant back and neck pain at this time, rating the pain an eight on a ten point scale.  (R. at 553.) Examination revealed multiple trigger points bilaterally in the paraspinal muscles and reduced reflexes and sensation in the lower extremities.  (*Id.*)  Dr. Sayegh diagnoses included diabetes, diabetic neuropathy, depression, anxiety, and sprain/strain in the lumbar and cervical areas.  (*Id.*)

Plaintiff continued to report similar pain to Dr. Sayegh from June 2007 to February 2008. (R. at 548–52.)  A February 2008 MRI of the cervical spine revealed "[d]iffuse disc degeneration with slight bulging at C5-6 and C6-7 without central or neural foraminal stenosis."  (R. at 537.) On March 12, 2008, an MRI of Plaintiff's lumbar spine demonstrated "[d]isc degeneration, bulging and central protrusion of the L4-5 disc without appreciable central canal or neural forminal stenosis."  (R. at 561.)  Dr. Sayegh diagnosed Plaintiff with degenerative disc disease in June 2008.  (R. at 546.)  In October 2008 and February 2009, Plaintiff reported that medication was improving his symptoms and life, but continued to complain of neck and back pain.  (R. at 544.)

Plaintiff underwent lumbar and cervical MRIs in February 2009.  (R. at 555–57.)  The lumbar MRI revealed "[d]egeneration of the L4-5 disc with central protrusion but no central or neural foraminal narrowing" as well as "[d]egeneration and bulging of the L5-S1 disc without central or neural foraminal stenosis."  (R. at 555.)  The cervical MRI revealed "[s]traightening of the normal lordosis may be due to muscle spasms.  Degeneration of the C2-3 through the C6-7 discs.  Slight bulging of the C5-6 and C6-7 discs without central canal or neural foraminal stenosis. . . ." (R. at 556.)

2.    Evaluations

On August 23, 2004, Dr. Hamza completed a physical capacity evaluation of Plaintiff. (R. at 299-300.)  Dr. Hamza opined that Plaintiff could not use his hands for simple grasping, but could use them for pushing and pulling, as well as fine manipulation.  (*Id.*)  Dr. Hamza found Plaintiff capable of walking and standing for one hour and sitting for two hours in an eight hour workday.  (*Id.*)  Furthermore, he found Plaintiff capable of only rare lifting for less than one hour in a workday.  (*Id.*)

Jerry McCloud, M.D., and Robert E. Norris, M.D., provided reviewing physician assessments of Plaintiff's physical capacity in 2005.  (R. at 363–70.)  Drs. McCloud and Norris concluded that Plaintiff could lift twenty pounds occasionally and ten pounds frequently; could walk or stand about six hours in a workday; and could sit about six hours in a workday.  (R. at 364.)  They found that Plaintiff should not climb ladders, ropes, or scaffolds.  (R. at 365.)  In reaching these conclusions they found Plaintiff's statements only partially credible.  (R. at 370.)

Mark E. Weaver, M.D., completed a consultive examination of Plaintiff and provided his report on October 26, 2006.  (R. at 501–09.)  Plaintiff reported to Dr. Weaver that he last worked in 1999 as a construction worker.  (R. at 501.)  Plaintiff walked with a stiff symmetric gait, but did not use an ambulatory device.  (R. at 502.)  After performing physical activities, Plaintiff was somewhat short of breath.  (*Id.*)  Physical examination of the spine revealed moderate involuntary muscle spasm with tenderness in the neck and lower back areas.  (R. at 504.)  Based on his examination, Dr. Weaver concluded the following:

> In view of his neck, lower back problems and breathing problems, he would probably be limited in the performance of physical activities involving sustained walking and repetitive or heavy lifting and carrying.  He would probably be capable of performing physical activities involving occasional moderate or

frequent light lifting and carrying, handling objects, speaking, hearing, following directions and travel in environments that would allow him the opportunity to change position from sitting to standing and vice-versa periodically.  I find no objective evidence in the exam today of activity limitations in the claimant's wrists or the sensory changes in his arms and legs.

(R. at 505.)

Maria Congbalay, M.D., provided a reviewing physician opinion as to Plaintiff's physical capacity in November 2006.  (R. at 510–17.)  Dr. Congbalay found Plaintiff capable of lifting fifty pounds occasionally and twenty-five pounds frequently; standing or walking about six hours in a workday; and sitting about six hours in a workday.  (R. at 511.)  Dr. Congbalay opined that Plaintiff's statements were partially credible, but noted that the clinical findings were not entirely consistent with the severity Plaintiff reported.  (R. at 515.)

Dr. Sayegh completed a physical capacities evaluation form concerning Plaintiff on April 5, 2009.  (R. at 619–20.)  He found that Plaintiff could stand or walk two hours in a workday; could sit two hours in a workday; and could lift eleven to twenty pounds occasionally.  (R. at 619.)  Dr. Sayegh opined that Plaintiff could perform simple grasping and fine manipulation, but could not use his hands for pushing and pulling.  (*Id.*)  According to Dr. Sayegh, Plaintiff was also incapable of using his feet for operating foot controls.  (*Id.*)  Dr. Sayegh felt Plaintiff was incapable of performing full-time work activity.  (R. at 620.)

Furthermore, Dr. Sayegh submitted a letter concerning Plaintiff on June 8, 2009.  In the letter Dr. Sayegh noted Plaintiff's complaints of leg and back pain, as well as Plaintiff's diabetes and depression.  (R. at 618.)  Dr. Sayegh opined that Plaintiff was unable to perform work, especially jobs involving "carrying heavy weight more than ten pounds or bending, operating any leg control[] machines . . . ."  (*Id.*)  Dr. Sayegh noted that Plaintiff was undergoing epidural

steroid injections and physical therapy for his pain.  (*Id.*)

B.    Mental Impairments

1.    Intelligence Testing

Plaintiff's school records indicated that he underwent  intelligence testing scores on at

least three different occasions.  (R. at 169.)  In January 1984, Plaintiff received a verbal IQ score

of 75, performance IQ score of 84, and full scale IQ score of 84.  In September 1985, Plaintiff's

verbal IQ score was 69, performance IQ score was 92, and full scale IQ score was 79.  (R. at

169.)  Finally, in November 1988, Plaintiff received a verbal IQ score of 80, a performance IQ

score of 86, and a full scale IQ score of 82.  (*Id.*)

2.    Evaluations

Richard L. Meilander, Ph.D. performed a psychological interview and evaluation of

Plaintiff on April 6, 2005.  (R. at 340–44.)  It appears plaintiff drove himself to the interview.

(R. at 340.)  Dr. Meilander found Plaintiff to be a poor historian and noted that Plaintiff did not

understand the nature of the evaluation.  (R. at 341.)  According to Dr. Meilander, Plaintiff's

"level of awareness . . . appears poor and estimated IQ is below average."  (R. at 342.)  In terms

of activities, Plaintiff reported walking and taking naps during the day.  (R. at 343.)  Dr.

Meilander diagnosed Plaintiff with major depression, single episode, without psychotic features

and borderline intellectual functioning.  (R. at 343.)  He assigned a GAF of 45.[2]  (*Id.*)  In terms

---

[2]  The GAF scale is used to report a clinician's judgment of an individual's overall level
of functioning.  *Hash v. Comm'r of Soc. Sec.*, 309 F. App'x 981, 988 n.1 (6th Cir. 2009).   "[A]
GAF score between 41 and 50 reflects 'serious symptoms such as suicidal thoughts, severe
obsessive rituals, or other serious impairments in social, occupational or school functioning.'"
*Hash*, 309 F. App'x at 988 n.1 (quoting American Psychiatric Association, Diagnostic &
Statistical Manual of Mental Disorders 30 (4th ed.1994)).

of work ability, Dr. Meilander felt Plaintiff was severely impaired in relating to coworkers and supervisors; moderately impaired in his ability to understand and follow directions; severely impaired in his ability to perform simple, repetitive tasks; and severely impaired in his ability to withstand work stress and pressures.  (R. at 343–44.)

On April 21, 2005, Tonnie A. Hoyle, Psy.D., completed a psychiatric review technique form after reviewing Plaintiff's file.  (R. at 345–62.)  Dr. Hoyle explicitly considered whether Plaintiff met the requirements of Listing § 12.04, affective disorders, and § 12.05, mental retardation.[3]  (R. at 345.)  In considering affective disorders, Dr. Hoyle found that Plaintiff did have depressive syndrome, but that he only satisfied three of the underlying criteria.  (R. at 348.)  In assessing mental retardation, Dr. Hoyle opined that Plaintiff's medically determinable impairment did not meet the applicable diagnostic criteria and was better characterized as borderline intellectual functioning.  (R. at 349.)  Dr. Hoyle further concluded that Plaintiff had mild restrictions of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of an extended duration.  (R. at 355.)

Dr. Hoyle also completed a mental residual functional capacity ("RFC") assessment form.  (R. at 359–62.)  She concluded that Plaintiff had marked limitations in his ability to understand, remember, and carry out instructions.  (R. at 359.)  Dr. Hoyle found Plaintiff moderately or not significantly limited in the remainder of the areas detailed on the form.  (R. at 359–60.)  After summarizing the findings of the consultive examination of Dr. Meilander, Dr.

---

[3]  The Social Security Regulations contain and appendix with "Listing" requirements, which, if met or equaled, necessitate a finding of disability.  *See* 20 C.F.R. Part 404, Subpart P, Appendix 1.

Hoyle concluded that Plaintiff was capable of simple routine tasks, in a low stress environment, with minimal interaction with others.  (R. at 361.)  She opined that the preponderance of the evidence did not fully support Dr. Meilander's conclusions.  (*Id.*)  David W. DeMuth, M.D., affirmed the psychiatric review and RFC assessments of Dr. Hoyle on July 15, 2005.  (R. at 345, 361.)

Dr. Alice Chambly completed a psychiatric review technique on May 3, 2006.  Dr. Chambly noted that Plaintiff alleged disability due to a learning disability, but felt that there was insufficient information to determine Plaintiff's ability.  (R. at 453.)

James N. Spindler, M.S., performed an examination and evaluation of Plaintiff on October 17, 2006.  (R. at 493–500.)  Plaintiff took public transportation to the appointment.  (R. at 493.)  Plaintiff reported last working in 1999 as a factory worker, but also mentioned doing odd jobs since that time.  (R. at 494.)  Furthermore, Plaintiff reported problems controlling his temper.  (*Id.*)  Mr. Spindler noted that Plaintiff appeared mildly depressed, and seemed tense throughout the evaluation.  (R. at 495.)  Plaintiff described that he often felt hopeless and had an average energy level.  (*Id.*)  Plaintiff stated that he was "able to go about the community as he feels he needs to, but he is not fond of being around crowds of people that he does not know." (R. at 496.)  In terms of daily activities, Plaintiff reported helping with some chores including washing dishes and sweeping floors.  (*Id.*)  At the time of the examination, Plaintiff stated that his hobbies were fishing and following sports and that he had friends with whom he talked, visited, watched sports, and played cards and pool.  (R. at 496–97.)  Plaintiff told Mr. Spinder that he sometimes goes for walks in the evening and enjoys throwing a football with his friends on the weekends.  (R. at 497.)

Mr. Spindler administered various tests during his evaluation of Plaintiff.  Mr. Spindler observed that Plaintiff appeared to make a good effort during the testing.  (*Id.*)  Plaintiff obtained a verbal IQ score of 68, a performance IQ score of 75, and a full scale IQ score of 69.  (*Id.*)  He noted these scores were in the mild range of mental retardation, but commented that Plaintiff appeared to be functioning in the borderline range of intelligence.  (*Id.*)  Memory testing indicated Plaintiff was in the extremely low to borderline ranges.  (*Id.*)  Mr. Spindler noted Plaintiff's memory scores were significantly low in comparison to people with similar intelligence scores.  (*Id.*)  In summarizing his evaluation results, Mr. Spindler noted that Plaintiff often contradicted himself in providing information.  (R. at 498.)  He diagnosed Plaintiff with attention deficit hyperactivity disorder ("ADHD"); depressive disorder in partial remission; generalized anxiety disorder; and intermittent explosive disorder.  (*Id.*)  He assigned a GAF of 60.[4]  (R. at 498.)  Mr. Spindler opined that Plaintiff's ability to relate to others was moderately impaired; his ability to understand, remember, and follow instructions was mildly to moderately impaired; his ability to maintain attention, concentration, persistence, and pace was mildly to moderately impaired; and that his ability to handle the stress of day-to-day work was moderately impaired.  (R. at 498–99.)

Carl Tishler, Ph.D., completed a psychiatric review technique concerning Plaintiff on November 7, 2006.  Dr. Tishler concluded that Plaintiff had ADHD, but that this did not rise to the level of Listing § 12.02 for organic mental disorders.  (R. at 524.)  Dr. Tishler evaluated

---

[4]  "A GAF score of 51-60 'indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (*e.g.* few friends, conflict with peers or co-workers).'"  *Price v. Comm'r Soc. Sec. Admin.*, 342 F. App'x 172, 177 n.1 (6th Cir. 2009) (quoting *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503 (6th Cir. 2006)).

Plaintiff for Listing § 12.04, affective disorders, diagnosing Plaintiff with a depressive disorder that did not meet the Listing requirements.  (R. at 526.)  Dr. Tishler also diagnosed Plaintiff with borderline intellectual functioning, generalized anxiety disorder, and intermittent explosive disorder, but again found that Plaintiff had no Listing level impairment.  (R. at 527–28, 530.)  According to Dr. Tishler, Plaintiff was mildly restricted in activities of daily living; had moderate difficulties in maintaining social functioning; had moderate difficulties in maintaining concentration, persistence, or pace; and had experienced no episodes of decompensation.  (R. at 533.)

On November 7, 2006, Dr. Tishler also assessed Plaintiff's mental RFC.  (R. at 518–21.)  Dr. Tishler opined that Plaintiff was moderately limited in several work related areas, but not markedly limited in any.  (*Id.*)  Dr. Tishler felt that Plaintiff was "mostly credible" in his allegations, and gave Mr. Spindler's conclusions weight.  (R. at 520.)  Ultimately, Dr. Tishler concluded the following:

> Functionally, the claimant is capable of comprehending, remembering, and carrying out simple task instructions.  He can make decisions, maintain attention, adhere to a schedule, and relate adequately on a superficial basis to coworkers and supervisors.  The claimant can adapt to a setting in which duties are routine and predictable.  He should avoid working closely with others to reduce the stress in the workplace.

(R. at 520.)

Dr. Sayegh completed a mental work-related assessment of Plaintiff's abilities on April 5, 2009.  (R. at 621–23.)  He found Plaintiff moderately limited in every category he considered.  (*Id.*)  These categories included following work rules, relating to others, dealing with work stress, understanding and carrying out instructions, and maintaining attention and concentration.  (R. at 621.)

## IV. EXPERT TESTIMONY

A.    <u>Medical Expert</u>

Jonathan Nusbaum, M.D., testified as a medical expert at the administrative hearing.  Dr. Nusbaum reported that Plaintiff had insulin dependent diabetes mellitus, with fair control at best. (R. at 656.)  Dr. Nusbaum opined that the record did not corroborate a diagnosis of diabetic neuropathy, noting that the nature of Plaintiff's complaints as to his lower extremities were not typical for such a diagnosis.  (*Id.*)  According to Dr. Nusbaum, despite Plaintiff's complaints of back and neck pain the records reflected generally normal findings.  (*Id.*)  Dr. Nusbaum found insufficient evidence to indicate that Plaintiff had sciatica or a herniated disk.  (*Id.*)  He also noted "[Plaintiff's] been treated with substantial narcotics preparations candidly without clear evidence for an indication."  (*Id.*)  Despite Plaintiff's testimony regarding his cane, Dr. Nusbaum noted no evidence of weakness.  (R. at 656–57.)  Dr. Nusbaum reported a full-scale IQ score of 69.  (R. at 657.)

From this information, Dr. Nusbaum, although uncertain about other Listing requirements, concluded that Plaintiff satisfied the Listing requirements of somatoform disorders, specifically, § 12.07A3, B1, and B3.  (*Id.*)  Dr. Nusbaum testified that "the symptoms, which [Plaintiff] perceives, are far in excess of the objective findings . . . I think he has an exaggerated perception of his symptoms . . . [that] substantially interferes with both his concentration and activities of daily living."  (*Id.*)  Dr. Nusbaum felt that this condition went back to January 2005.  (R. at 658.)  Dr. Nusbaum further clarified that based on the physical evidence Plaintiff was capable of at least light work.  (*Id.*)  Nevertheless, Dr. Nusbaum reiterated:

> [B]ased on the complaints of discomfort, reiterated in the record again and again and again, the requirements of the cane and everything else, that strikes me as a substantial perception which magnifies the objective physical findings which is . . . number three of the "A" Criteria in 12.07 and the testimony in the record . . . strongly suggests that he does have substantial problems with concentration and with his activities of daily living.

(R. at 658–59.)

Finally, Dr. Nusbaum stated that there were some issues with Plaintiff's compliance regarding his diabetes.  (R. at 659.)  Dr. Nusbaum felt Plaintiff's intellectual capacity was a substantial cause of noncompliance.  (*Id.*)

B.  <u>Vocational Expert</u>

Lynne Kaufman testified as a vocational expert at the administrative hearing.  She classified all of Plaintiff's past work as unskilled ranging from medium to very heavy exertion categories.  (R. at 661.)  The ALJ asked Ms. Kaufman to consider the mental issues, and RFC described in Dr. Tishler's assessment.  (*Id.*)  Ms. Kaufman concluded that a person with such restrictions could do unskilled work limited to only superficial relations with others.  (R. at 662.)  She further concluded that if such a person could perform light work he could do some types of jobs including light cleaning, dishwasher, and laundry worker.  (R. at 662.)  She estimated that jobs in the region would total 300 light cleaning jobs, 100 dishwashing jobs, and 200 laundry worker position, with jobs at a state level 25 times greater.  (*Id.*)  Ms. Kaufman indicated that if limited to the extent Dr. Sayegh provided, such limitations would not allow a person to perform any type of work.  (R. at 662–63.)

## V.  ADMINISTRATIVE DECISION

The ALJ issued a decision on August 4, 2009.  At the first step of the sequential

evaluation process,[5] the ALJ found that Plaintiff had not engaged in substantially gainful activity since March 9, 2006.  (R. at 18.)

Next, the ALJ found that Plaintiff had severe impairments including "Type I diabetes mellitus with neuropathy; degenerative disease of his cervical and lumbar spine; asthma/chronic obstructive pulmonary disease; gastroesophageal reflux disease; borderline intellectual functioning; R/O (rule out) somatoform disorder; and affective, anxiety, and personality-related disorders."  (*Id.*)  At step three, the ALJ then determined that Plaintiff did not have an impairment or combination of impairments that met or equaled the level of severity described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 19–22.)  Within this section, the ALJ rejected the opinion of Dr. Nusbaum that Plaintiff met the requirements within Listing § 12.07 for somatoform disorder.  (R. at 20.)

At step four of the sequential process, the ALJ evaluated Plaintiff's residual functional

---

[5]  Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.    Is the claimant engaged in substantial gainful activity?
2.    Does the claimant suffer from one or more severe impairments?
3.    Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.    Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.    Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

capacity ("RFC").  The ALJ found Plaintiff physically capable of performing light work.  (R. at 22.)  In terms of mental capacity, the ALJ concluded the following:

> [Plaintiff] is capable of comprehending, remembering, and carrying out simple task instructions and making decisions, maintaining attention, adhering to a schedule, and relating adequately on a superficial basis with coworkers and supervisors.  He can adapt to work settings in which duties are routine and predictable.  To reduce workplace stress, he must avoid working closely with others.

(R. at 22.)  In reaching this determination, the ALJ found Plaintiff's statements regarding the intensity, persistence, and limiting effects of his symptoms not entirely credible.  (R. at 23.)  He rejected the opinions of Drs. Hamza and Sayegh.  (R. at 24.)

The ALJ determined that Plaintiff could not perform past work.  (R. at 25.)  Nevertheless, relying on the testimony of Ms. Kaufman, he concluded there were a significant number of jobs in the national economy that Plaintiff could perform.  (*Id.*)   He therefore concluded that Plaintiff was not disabled under the Social Security Act.  (*Id.*)

## VI. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir.

17

1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the [Commissioner's] decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the Commissioner's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VII. LEGAL ANALYSIS

Plaintiff contends that the ALJ committed two errors in this case. First, Plaintiff contends that the ALJ erred in rejecting Dr. Nusbaum's opinion as to somatoform disorder. Second, Plaintiff maintains that the ALJ erred in failing to give controlling weight to the opinions of Drs. Hamza and Sayegh. The undersigned disagrees on both counts and finds that substantial evidence supports the ALJ's decision.

A.     Medical Expert Opinion and Listing § 12.07

The ALJ obtained testimony from Dr. Nusbaum as a medical expert. The Regulations allow for an ALJ to "ask for and consider opinions from medical experts on the nature and

severity of [a claimant's] impairments . . . ." 20 C.F.R. § 416.927(f)(2)(iii). Nevertheless, "'[t]he ALJ is not bound to accept the opinion or theory of any medical expert, but may weigh the evidence and draw his own inferences.'" *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (quoting *McCain v. Dir., OWCP*, 58 F. App'x 184, 193 (6th Cir. 2003)). In weighing the opinions of medical experts, like any other medical opinion, an ALJ must consider a variety of factors including the examining or treating relationship, consistency of the opinion, supportability of the opinion, and specialization of the source. 20 C.F.R. §§ 416.927(d), 416.927(f)(2)(iii).

Dr. Nusbaum's medical expert opinion specifically addressed Listing § 12.07 for somatoform disorder. As one Court of Appeals has noted, somatoform disorder generally refers to a situation in which "one has physical symptoms, but there is no physical cause." *Sims v. Barnhart*, 442 F.3d 536, 537 (7th Cir. 2006). For purposes of a disability finding, Listing § 12.07 defines somatoform disorders as follows:

> Somatoform Disorders: Physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied.
>
> A.     Medically documented by evidence of one of the following:
> . . .
> 3.     Unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury;
>
> And
>
> B.     Resulting in at least two of the following:
>
> 1.     Marked restriction of activities of daily living; or
> 2.     Marked difficulties in maintaining social functioning; or
> 3.     Marked difficulties in maintaining concentration, persistence, or

pace; or

4.         Repeated episodes of decompensation, each of extended duration.

20 C.F.R. 404, Subpt. P, App. 1 § 12.07.

In this case, the ALJ did not completely disregard Dr. Nusbaum's diagnosis of somatoform disorder.  In assessing Plaintiff's severe impairments he recognized somatoform disorder as a rule-out diagnosis.[6]  The ALJ, however, rejected Dr. Nusbaum's opinion "only as to his opinion that the claimant has a somatoform disorder *that meets the requirements of § 12.07*." (R. at 20 (emphasis added).)  In rejecting this opinion the ALJ offered the following reasons:

> His opinion is inconsistent with the medical evidence that confirms degenerative disease of the claimant's neck and back, causing the claimant chronic type pain. . . . [T]he claimant's pain complaints are out of proportion with the medical evidence, as a result of exaggerated and/or noncompliance with treatment recommendations. Further, Dr. Nusbaum is not a mental health professional and does not have the specific medical expertise for such a determination.

(R. at 20.)  Furthermore, in terms of the "B criteria," the ALJ found that Plaintiff had mild limitations to activities of daily living; moderate limitation to social functioning; moderate limitation to concentration, persistence, or pace; and that there was no evidence of extended episodes of decompensation.  (R. at 21.)

Although the undersigned does not endorse the ALJ's entire line of reasoning,[7]

---

[6]  Other courts have specifically defined a rule-out diagnosis as "['] evidence that [the paitent] may meet the criteria for a diagnosis but [the doctors] need more information to rule it out.'"  *U.S. v. Muhammad*, No. 07-737-04, 2010 WL 2533777, at *4 n.8 (E.D. Pa. 2010) (quoting *United States v. Grape*, 549 F.3d 591, 598–99 (3d Cir. 2008)).

[7]  The undersigned does not find the ALJ's first reason for rejecting Dr. Nusbaum, that the record contained evidence of degenerative disease, persuasive.  As both parties have pointed out in briefing, somatoform disorders can exist even when there is some underlying physical medical condition.  *C.f. Wall v. Astrue*, 561 F.3d 1048, 1059 n.18 (10th Cir. 2009) (suggesting that somatoform disorders can exist when physical complaints are "grossly in excess of what would be expected from a patient's diagnoses").  In making this comment the ALJ may have

20

substantial evidence supports the ALJ's rejection of Dr. Nusbaum's opinion in this case.  First,

somatoform disorder is a mental impairment and Dr. Nusbaum is not a mental health

professional.  *See Buxton v. Halter*, 246 F.3d 762, 764 n.1 (6th Cir. 2001) (defining somatoform

disorder); *see also White v. Barnhart*, 415 F.3d 654, 658–59 (7th Cir. 2005) (holding that it was

not unreasonable for an ALJ to discount the somatoform disorder diagnoses of "two nontreating

doctors who specialize in physical impairments").  Accordingly, although Dr. Nusbaum did have

access to the entire record as a medical expert, he did not have the specialization to lend support

his diagnosis.  In this case, various mental health professional, many of whom considered

whether Plaintiff met the § 12.00 Listing requirements, provided consulting and reviewing

opinions.  None of these physicians suggested that Plaintiff met or equaled § 12.07, or even

diagnosed somatoform disorder.  Furthermore, none of Plaintiff's examining or treating medical

physicians, despite knowledge of Plaintiff's pain complaints and access to some, if not all, of

Plaintiff's diagnostic test results, opined that Plaintiff had or might have somatoform disorder.

Additionally, substantial evidence supports the ALJ's credibility decision, further

bolstering his rejection of Dr. Nusbaum's opinion.[8]  Plaintiff suggests that it was inconsistent for

the ALJ to reject Dr. Nusbaum's somatoform opinion, but then find that Plaintiff was not entirely

credible because he exaggerated his pain.  Although questions regarding somatoform disorder

---

been trying to cast doubt on Dr. Nusbaum's reasoning in reaching his diagnosis.  Specifically,
although Dr. Nusbaum explicitly noted a March 2005 MRI which demonstrated normal finding,
he did not explicitly mention later testing that demonstrated at least some degeneration.  (*See* R.
at 656–59.)  Regardless, even dismissing the ALJ's first reason, various other factors support the
ALJ's rejection of Dr. Nusbaum's opinion.

[8]  The Court notes the general deference it must give to the ALJ's credibility
determination.  *Infantado v. Astrue*, 263 Fed. Appx. 469, 475 (6th Cir. 2008).

21

and a claimant's credibility as to pain share similar components, they are distinct.  As one Court

of Appeals has noted:

> Pain is always subjective in the sense of being experienced in the brain. The question
> whether the experience is more acute because of a psychiatric condition is different
> from the question whether the applicant is pretending to experience pain, or more
> pain than she actually feels. The pain is genuine in the first, the psychiatric case,
> though fabricated in the second. The cases involving somatization recognize this
> distinction. *Metz v. Shalala*, 49 F.3d 374, 377 (8th Cir.1995); *Latham v. Shalala*,
> supra, 36 F.3d at 484; *Easter v. Bowen*, supra, 867 F.2d at 1129.

*Carradine v. Barnhart*, 360 F.3d 751, 754–55 (7th Cir. 2004).

In this case, there are a number of reasons to question whether Plaintiff was entirely

genuine in reporting his level of pain and other symptoms.  As the ALJ pointed out, despite

Plaintiff's complaints of physical pain, he also reported that he engaged in numerous activities to

consulting physicians.  Most noteworthy are Plaintiff's reports of fishing, playing pool, and

throwing a football around with friends on the weekends.  Mr. Spindler explicitly noted the

contradiction between Plaintiff throwing a football for pleasure, while complaining of chronic

neck, back, and wrist pain.[9]  (R. at 497.)  Various physicians issued opinions suggesting Plaintiff

was less than entirely credible.  (*See, e.g.*, 498, 515, 520.)  Additionally, as the ALJ pointed out,

the record does not contain any clear corroboration in the medical records regarding Plaintiff's

reports of seizures and passing out.  Furthermore, the record reflects that Plaintiff has been less

than fully compliant with treatment.  Although this might be due in part to Plaintiff's intellectual

functioning, as Dr. Nusbaum notes, another potential explanation is that Plaintiff is not in as

---

[9]  A similar contradiction exists with regards to Plaintiff's reports of breathing problems.
Although Plaintiff testified to severe breathing problems at the hearing, the record suggests
Plaintiff continued to smoke during at least a portion of his alleged disability period.  (*See, e.g.*,
R. at 502.)

much pain as his complaints suggest.  Based on these circumstances, the ALJ was reasonable in concluding that Plaintiff's complaints of pain were disproportionate to the medical evidence because of Plaintiff's lack of full credibility rather than a disabling somatoform disorder.

Furthermore, substantial evidence supports the ALJ's determination that Plaintiff did not satisfy all the components of Listing § 12.07.  As noted above, to meet the requirements of Listing § 12.07, Plaintiff must satisfy two of the "B criteria."  20 C.F.R. 404, Subpt. P, App. 1 § 12.07.  The ALJ, however, found Plaintiff had only mild or moderate limitations in these areas with no episodes of decompensation.  Although Dr. Nusbaum opined that Plaintiff had marked restrictions in daily activities as well as concentration and persistence, other physicians suggested otherwise.  For examples, Drs. Tishler, Hoyle, and Demuth all offered opinions in these areas consistent with the ALJ's decision.  Mr. Spindler's findings and opinions also appear generally consistent with the ALJ's conclusions.

Finally, to the extent Plaintiff suggests that the ALJ failed to sufficiently develop the record, the undersigned disagrees.  "An ALJ has discretion to determine whether further evidence . . . is necessary."  *Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 675 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1517, 416.917).  By the time of the hearing, the record already contained extensive medical evidence considering both Plaintiff's physical and mental impairments.  As noted above, various mental health physicians considered the applicability of the § 12.00 Listing requirements.  Under these circumstances, the mental impairment diagnosis of a non-mental health professional, unsupported by any other diagnosis in the record, was not enough to require the ALJ to seek additional evidence.

Accordingly, the ALJ did not err in rejecting Dr. Nusbaum's opinion that Plaintiff had a

23

Listing level somatoform disorder.

B.    Treating Physician Opinions

As noted above, Plaintiff also suggests that the ALJ erred in weighing the opinion evidence of his treating physicians.  The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. § 404.1527(d).  Certain types of opinions, however, are normally entitled to greater weight.  20 C.F.R. § 404.1527(d).  For example, the ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . . ." 20 C.F.R. § 404.1527(d)(2); *Blakley*, 581 F.3d at 408.

If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(d)(2).  The Sixth Circuit, however, has noted:

> On the other hand, a Social Security Ruling explains that "[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent [] with other substantial evidence in the case record." Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *2 (July 2, 1996).  If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician.  *Wilson* [*v. Comm'r Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)]; *see also* 20 C.F.R. § 404.1527(d)(2).

*Blakley*, 581 F.3d at 406.

Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] [the claimant's] treating source's opinion." 20 C.F.R. § 404.1527(d)(2).  Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted).

The Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity and the ultimate determination of disability.  20 C.F.R. § 404.1527(e).  Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance.  20 C.F.R. § 404.1527(e); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

In this case, the ALJ properly rejected the treating physician opinions of Drs. Hamza and Sayegh.  As described above, Dr. Hamza opined in August 2004, that Plaintiff could not use his hands for grasping; could not walk, stand, or sit for a full workday; and was only capable of lifting for less than an hour.  Dr. Sayegh submitted an opinion in April 2009 indicating Plaintiff could not stand, walk, or sit for an entire workday; could lift eleven to twenty pounds occasionally; and was incapable of performing full-time work.  Dr. Sayegh later provided a letter indicating Plaintiff was incapable of performing any job requiring him to carry more than ten pounds.

First, the ALJ satisfied the procedural reason-giving requirement.  The ALJ gave multiple reasons for rejecting the assessments of Plaintiff's treating physicians.  Specifically, the ALJ

25

concluded that the objective evidence did not support their assessments and the physicians appeared to rely on Plaintiff's subjective complaints, which were not credible.  The ALJ also noted that Dr. Sayegh's letter opinions were inconsistent with the opinions on his April 2009 form.  Furthermore, considering the surrounding context of the ALJ's RFC analysis, the ALJ's decision made clear that the opinions of Drs. Hamza and Sayegh were inconsistent with the opinions of various other physicians.

Second, substantial evidence supports the ALJ's rejection of the treating physician opinions.  Simply put, this case involves a number of physician opinions, which ultimately forced the ALJ to evaluate largely inconsistent evidence.  Several of the relevant opinions suggest less severe restrictions than the opinions of Drs. Hamza and Sayegh.  For example, Drs. McCloud and Norris issued opinions generally consistent with the light exertional level.  Dr. Congobalay's opinion appears to indicate Plaintiff is capable of performing some range of medium work.  From his consultive examination Dr. Weaver concluded Plaintiff was capable of performing "occasional moderate or frequent light lifting and carrying . . . ."  (R. at 505.) Moreover, upon his review of the entire record, Dr. Nusbaum found Plaintiff capable, from a physical standpoint, of light work.  Dr. Nusbaum also indicated that the objective medical testing did not appear to account for the severity of Plaintiff's complaints of pain.  This finding lends support to the notion that Drs. Hamza and Sayegh relied on Plaintiff's subjective complaints of pain in assigning their restrictions.  As noted above, the ALJ was justified in finding these subjective complaints less than entirely credible.

Accordingly, although the treating physicians' opinions in this case suggest a more restrictive RFC than the ALJ assigned, these opinions were not entitled to controlling weight.

The ALJ was reasonable in assigning a less restrictive RFC.  *See Blakley*, 581 F.3d at 406 ("'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'") (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).

## VIII.  CONCLUSION

Based on the record as a whole, substantial evidence support the ALJ's decision in this case.  For the foregoing reasons, it is **RECOMMENDED** that the Court **AFFIRM** the decisions of the Commissioner.

## IX.  NOTICE

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to

magistrate judge's report and recommendation).  Even when timely objections are filed, appellate

review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994

(6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the

issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date: August 4, 2011                              <u>      /s/ *Elizabeth A. Preston Deavers*      </u>
                                                            Elizabeth A. Preston Deavers
                                                            United States Magistrate Judge